**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MICHAEL W. KOBUS, | Civil No. 07-3881 (JRT/RLE) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| THE COLLEGE OF ST. SCHOLASTICA, INC., a Minnesota non-profit corporation, | |
| Defendant. | |

Sonja Dunnwald Peterson, **DUNNWALD & PETERSON, P.A.**, Suite 1150E, 412 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Joseph J. Roby, Jr. and Diana Bouschor Dodge, **JOHNSON KILLEN & SEILER, P.A.**, Suite 800, 230 West Superior Street, Duluth, MN 55802, for defendant.

Plaintiff Michael W. Kobus worked as a full-time painter for defendant The College of St. Scholastica, Inc. ("St. Scholastica") from 1997 until mid-January of 2007. This case concerns the circumstances surrounding the end of his employment. Kobus alleges that St. Scholastica interfered with his exercise of rights under the Family Medical Leave Act ("FMLA") and discriminated against him on the basis of his depression in violation of the Minnesota Human Rights Act ("MHRA") and the Americans with Disabilities Act ("ADA"). Kobus also alleges that he was constructively discharged. St. Scholastica now moves for summary judgment. For the reasons given below, St. Scholastica's motion is granted.

## BACKGROUND

Kobus was hired by St. Scholastica as a painter in August 1997. On June 24, 2005, Kobus was diagnosed with an anxiety disorder. (Peterson Aff. Ex. A at 2.) Kobus was given a prescription for Paxil, and he has continued to take it ever since. (*Id*.; Peterson Depo. at 69.)

In mid-2005, Kobus began informing his supervisor, Tim Orlowski, that he was suffering from anxiety and stress. (Kobus Depo. at 79-80; Orlowski Depo. at 105.) During the time period relevant to this case, Kobus told Orlowski about several stressful and tragic events from his personal life, including the illness and death of Kobus's mother after an apparent medical mistake; the serious illness of his brother; his ex-wife's cancer diagnosis; and news that his son had been diagnosed with bipolar disorder and had subsequently dropped out of college (at St. Scholastica). (Kobus Depo. at 60-61, 80; Orlowski Depo. at 96-101, 103-04.) Kobus, however, never informed St. Scholastica that he was taking any sort of medication for his mental or emotional health and never indicated that he was suffering from depression. (*See* Kobus Depo. at 107-08.)

In November 2006, Kobus told Orlowski that he might need time off from work to deal with his stress and anxiety. (Orlowski Depo. at 122.) Orlowski recognized that Kobus may be eligible for leave under the FMLA. (*Id*. 126.) Accordingly, Orlowski provided Kobus with the resources he would need to apply for FMLA leave. (*Id*. 122.) Specifically, Orlowski provided Kobus with a form entitled "Request for Family Medical Leave." (Kobus Depo. at 83-84; Peterson Aff. Ex. C.) That form indicates that employees seeking FMLA leave because of a serious health condition must have a

physician complete a "Certification of Health Care Provider." (*See* Peterson Aff. Ex. C at 1 ("Physician: Complete Parts 1, 2, and 4").)  That certification requires an explanation of the patient's diagnosis; the name, title, address, and phone of the health care provider who will be administering treatment; an assessment of the patient's ability to work; and – in a section titled "Provider Verification" – a signature from a health care provider.  (*Id*.) These requirements were consistent with the section of St. Scholastica's Staff Handbook addressing "Family and Medical Leave," which states "[t]he College may require medical certification to support a claim for leave for an employee's . . . serious health condition . . . ."  (*Id*. Ex. D at 4.)  A second section of the handbook repeats this condition in even stronger language, stating that requests for FMLA leave "**must** be accompanied by the Medical Certification form."  (*Id*. at 5 (emphasis added).)  Similarly, a poster in St. Scholastica's workplaces stated that employees seeking FMLA leave "may be required to provide advance notice and medical certification."  (*Id*. Ex. E.)

      Kobus told Orlowski that he did not believe he needed FMLA leave because he thought he could handle his anxiety on his own.  (Kobus Depo. at 84, 85.)  Accordingly, he did not fill out the leave application provided by Orlowski, and did not otherwise express an interest in pursuing leave.

      Just months later, Kobus was out of work from January 15 to January 18 of 2007. (Peterson Aff. Ex. G; Orlowski Depo. at 157-58.)  Kobus indicates that this was due to headaches and neck pain caused by stress and anxiety.  (Kobus Depo. at 87-89.)  Kobus notes that this was brought on by his discovery that his brother had just weeks to live and that his son was had dropped out of college.  (*Id*. at 87-88.)

On January 18, 2007, Kobus spoke with Orlowski on the phone and requested a leave of absence for "mental health" reasons. (*Id*. at 90, 138.) Kobus explained the situations involving his brother, his ex-wife, and his son. (*Id*.) Kobus also noted that he was experiencing knots in his neck and pains in his head, and that a doctor thought these physical symptoms were the result of stress and anxiety. (*Id*. at 140.) However, Kobus did not indicate that he was taking any medications, and does not recall mentioning depression. (*Id*. at 93.) Kobus describes the rest of their conversation as follows:

> Q:   . . . And then what did [Orlowski] say?
>
> A:   He asked about the Family Medical Leave Act.
>
> Q:   Okay. He brought that up?
>
> A.:  Yeah. "Are you going to do that?" And I says, "Well, I don't know. What's involved?" And he said something about a doctor, and I says, "I don't have a doctor. Do you have anything else?"
>
> Q:   Okay. And then what did [Orlowski] say?
>
> A:   He says, "I'll check and I'll get back to you later on."
>
> Q:   When [Orlowski] mentioned the Family and Medical Leave, did he tell you you'd have to get a doctor to sign some piece of paper to apply for the leave?
>
> A:   That's what he said.
>
> Q:   Okay.
>
> A:   And that's when I asked, "Is there any" – you know, "This might be some trouble. I don't have a doctor. Is there any other way I can go?"[1]

---

[1] Following his deposition, Kobus submitted several "corrections" to his testimony. (*See* Peterson Aff. Ex. I.) First, he contends that he simply told Orlowski he did not have a doctor

(Footnote continued on next page.)

(Kobus Depo. at 91.)[2]  Kobus told Orlowski that if he could not get leave, he would have to resign, and indicated that he had already typed his resignation.  (*Id*. at 95.)

Orlowski called back later that afternoon.  (*Id*. at 93-94.)  According to Kobus, Orlowski indicated "he was working on a deal where I would get paid two weeks' severance pay, and I wouldn't have to work for it, and they would accept my resignation because there was nothing available for me."  (*Id*. at 94.)  While Orlowski indicates that he confirmed that Kobus did not want to seek FMLA leave, (*see* Orlowski Depo. at 166), Kobus denies that they discussed FMLA leave again.  Kobus submitted his resignation the next day.  (*Id*. at 97-98.)

On January 19, Kobus came to St. Scholastica for an exit interview with Jill Sikkink, St. Scholastica's Associate Director for Human Resources.  (*See* Kobus Depo. at 106-07.)  In his deposition, Kobus responded to questions about this interview as follows:

> Q:   During the meeting with Ms. Sikkink, did you tell her you had

---

(Footnote continued.)

"right now."  (*Id*.)  Second, he contends that Orlowski did not specifically state that the doctor's certification was required; rather "[h]e just said something about a doctor signing a form."  (*Id*.)

[2] Orlowski's recollection of Kobus's statements about FMLA leave was consistent with Kobus's account.  The critical passages of Orlowski's deposition proceeded as follows:

> Q:   Did you specifically ask [Kobus] if he wanted FMLA [leave]?
>
> A:   Yes.
>
> Q:   Do you recall what he said in response?
>
> A:   He did not want to go see a doctor; didn't want to go through the process; just wanted a leave of absence.

(Orlowski Depo. 165-66.)

depression?

A: No.

Q: Did you tell her you were taking medications?

A: No.

Q: Did you tell her that you thought you should have been granted a leave of absence?

A: No. I figured she was in on it too.

Q: Did you tell her you thought you were being pressured to quit?

A: No.

(Kobus Depo. at 106-07.)  Kobus also confirmed that this was consistent with his disclosures throughout his employment:

Q: During that [last] year and a half, did you ever tell anyone at the college in management – Tim [Orlowski] . . . Jill [Sikkink], anybody – that you had been diagnosed with depression?

A: No I don't believe that I did.

Q: Did you ever tell anybody in management that you were taking medications for any sort of mental or emotional health condition?

A: No. I wasn't real proud of that fact.

(*Id*. at 107-08.)

In February 2007, Kobus sought unemployment benefits through the Minnesota Department of Employment and Economic Development ("DEED").  Kobus was informed that if his resignation was due to medical reasons, he would need to provide a statement from his medical provider about his condition.  (Kobus Aff. ¶5.)  Kobus saw a doctor, and on February 28, 2007, Kobus was diagnosed with a depressive disorder.

(Peterson Aff. Ex. A at 11.)  The treating physician listed symptoms including "significant emotional distress, withdrawal from activities, symptoms causing problems at home, symptoms causing problems at work." (*Id*. Ex. A at 9.)  The physician also indicated in a statement provided to DEED that it had been "medically necessary" for Kobus to leave his employment because of "illness or disability," and that he had first been treated for this disability on June 24, 2005.  (*Id*. Ex. B.)

DEED notified St. Scholastica that Kobus was eligible for unemployment benefits. (*Id*. Ex. H.)  DEED's notice stated that "[m]edical evidence shows the applicant's condition required that the applicant quit.  The applicant informed the employer of the medical reason, requested accommodation, and none was provided." (*Id*.)

On August 30, 2007, Kobus filed this action against St. Scholastica in state court, alleging that St. Scholastica interfered with his exercise of rights under the FMLA and discriminated against him on the basis of his disability in violation of the MHRA.  Kobus also alleges that he was constructively discharged.  St. Scholastica subsequently removed this action to federal district court.  On November 30, 2007, Kobus amended his complaint to include a claim for disability discrimination in violation of the ADA.  St. Scholastica now moves for summary judgment on all of Kobus's claims.

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit,

and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**I. FMLA**

Under the FMLA, an eligible employee is entitled to twelve weeks of unpaid leave during any twelve-month period for any of several reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercise of this right. § 2615(a)(1). "However, in order to invoke the protections of FMLA, an employee must notify his employer of his 'intention to take leave.'" *Sanders v. May Dep't Stores Co.*, 315 F.3d 940, 944 (8th Cir. 2003) (*quoting* 29 U.S.C. § 2612(e)(2)(B)).

Here, Kobus contends that St. Scholastica interfered with his exercise of FMLA rights by failing to grant him leave for his depression. St. Scholastica moves to dismiss this claim on several grounds. First, St. Scholastica argues that Kobus has failed to demonstrate a serious health condition. Next, St. Scholastica argues that it should not be liable under the FMLA because Kobus "concealed" his health condition, refused an invitation to apply for FMLA leave, failed to supply a certification of his condition, and failed to document how his condition impacted his ability to perform his job. Because

the Court concludes that Kobus failed to adequately indicate his intent to take FMLA leave, the Court need not address the additional issues raised by St. Scholastica.

The Eighth Circuit dealt with facts similar to those presented here in *Sanders v. May Dep't Stores Co.*, 315 F.3d 940 (8th Cir. 2003). In *Sanders*, an employee informed her employer that she intended to have a sex change operation. *Id*. at 944. Because she wanted to maintain some level of anonymity for a month prior to the operation, the plaintiff sought to take a temporary leave of absence from her job. *Id*. The employer suggested that the plaintiff may be eligible for leave under the FMLA. *Id*. The plaintiff declined this option, however, explaining that because of confidentiality concerns she did not want to get a medical certification confirming her serious health condition. *Id*. The plaintiff ultimately resigned, but later brought an action against her employer, alleging that the employer had interfered with her exercise of her FMLA rights. *Id*. In an appeal of a denial of a motion for judgment as a matter of law or a new trial – after a jury had found in favor of the employer – the Eighth Circuit rejected this argument, stating that it was plain that the plaintiff "did not actually attempt to pursue FMLA leave." *Id*.

St. Scholastica contends that this principle applies here as well. Kobus responds to this argument only briefly in a footnote, arguing that he never "expressly rejected" Orlowski's invitation to take leave. (*See* Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 17 n.13.) Kobus contends that he simply indicated "that he didn't have a doctor at the time, so getting a form signed might present some trouble." (*Id*.)

The Court agrees that even taking Kobus's conversation with Orlowski in the light most favorable to Kobus, he failed to adequately state an intent to take FMLA leave.

Under the FMLA, St. Scholastica is entitled to require its employees to supply a certification from a health care provider with any leave requests. *See* 29 U.S.C. § 2613(a). It is reasonably apparent from St. Scholastica's employee handbook, its workplace posters, and the certification forms in its leave application that it is St. Scholastica's practice to invoke this right. (*See* Peterson Aff. Ex. C, D, E.) Accordingly, when Kobus first mentioned the possibility of taking leave in November 2006, Orlowski provided him with a leave application that included a certification form. (Kobus Depo. at 82-84.) Later, when Kobus contacted Orlowski on January 18, they discussed medical certification again. (Kobus Depo. at 91.) Kobus indicated that the certification requirement would be "trouble" because he did not currently have a doctor, asked if there were any other options, and resigned when Orlowski indicated his options were limited. (*Id.* at 91, 96.) In those circumstances, the Court concludes that there is no genuine issue of material fact as to whether Kobus sufficiently stated an intention to take FMLA leave. As in *Sanders*, Kobus was informed of the certification requirement and then declined to either complete a leave application or specifically indicate a continuing interest in taking FMLA leave.[3] Indeed, he admits that he expressed doubt about whether

---

[3] Kobus notes that at some point late in his conversation with Orlowski, "I told him I would take anything; that I needed leave." (Kobus Depo. 91.) Kobus contends that this is evidence of his continuing intent to take FMLA leave. The Court disagrees that this affects the result in this case. Kobus's comment came immediately after he told Orlowski that the medical certification "might be some trouble," and asked "[i]s there any other way I can go?" (*Id.*) In those circumstances, Kobus was either asking about other forms of leave or asking St. Scholastica to relax the medical certification requirement. If it was the former, Kobus was moving past his FMLA request. If it was the latter, enforcement of the certification requirement was St. Scholastica's statutory right. *See* 29 U.S.C. § 2613(a). Kobus cannot base a viable claim on St. Scholastica's decision to invoke that right. In any event, Kobus had the FMLA

(Footnote continued on next page.)

he could fulfill the leave application's requirements. In those circumstances, there was no continuing FMLA request for St. Scholastica to deny or interfere with.

Kobus argues that his claim should not be dismissed on these grounds because St. Scholastica failed to provide written notice clearly articulating the certification requirement. The regulations implementing the FMLA require employers to provide employees with written guidance on the Act, including "any requirements for the employee to furnish medical certification of a serious health condition and the consequences of failing to do so." 29 C.F.R. § 825.301(b)(1)(ii). The regulations add that each time an employee raises a need for leave, written notice of any certification requirement is required. § 825.301(c)(2)(i). The regulations also state, however, that if a particular employee has already been given notice of the requirement within a six-month period, oral notice is sufficient. § 825.301(c)(2)(ii).

Here, when Kobus and Orlowski discussed FMLA leave in November 2006, Orlowski undisputedly provided him with the "Request for Medical Leave" form, which indicates that physicians are to complete the form's certification sections. (Kobus Depo. at 82-84.) The form adds, "It is your responsibility to ensure this form is filled out completely." (Peterson Aff. Ex. C at 1.) The form also requires employees to affirm that they understand the FMLA policies in the employee handbook, which state that leave requests "must" be accompanied by the medical certification materials. (*Id*.; *id*. Ex. D at

_____
(Footnote continued.)

application in his possession, and does not indicate that he either filled it out or expressed his intent to do so.

5.) In those circumstances, Kobus clearly received sufficient written notice in November 2006 to satisfy 29 C.F.R. § 825.301(b)(1)(ii).[4] Thus, the oral notice of this requirement that Kobus received from Orlowski on January 18, 2007, less than three months after the form was provided, was sufficient to meet the FMLA's requirements.[5] (See Kobus Depo. at 91.) Accordingly, Kobus's FMLA claim is dismissed.[6]

## II.    ADA & MHRA

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such an individual." 42 U.S.C. § 12112(a). "To make a prima facie case in a reasonable accommodation claim under the ADA, the plaintiff must show []he (1) has a disability within the meaning of the ADA,

---

[4] Kobus accurately notes that another passage in the employee handbook and the workplace posters both merely state that St. Scholastica "may" require medical certification. (*See* Peterson Aff. Ex. D at 4, Ex. E.) The Court disagrees, however, that this undermines the sufficiency of St. Scholastica's notice. As an initial matter, the Court does not agree that St. Scholastica had to announce that it would enforce the certification requirement at all times and in all cases in order to effectively communicate its policy. Moreover, Kobus was undisputedly given a leave application that called for a physician to complete the certification form.

[5] As noted above, Kobus sought to qualify his statements to Orlowski after his deposition, indicating that Orlowski "just said something about a doctor signing a form." (Peterson Aff. Ex. I.) In light of the rest of the exchange, however, this change makes little difference. Kobus says that after Orlowski said "something" about certification, he asked if there was any "other" way he could go. (Kobus Depo. 91.) In other words, Kobus plainly understood that certification presented an obstacle.

[6] Kobus also argues that St. Scholastica was not free to reject an FMLA claim for a mere failure to follow its internal procedures. *See, e.g.*, *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 722 (6th Cir. 2003). However, the critical, procedural requirement at issue here – the requirement that Kobus provide certification from a health care provider – was not a mere internal, company requirement. As noted above, St. Scholastica is specifically permitted under the FMLA and its regulations to require medical certifications from employees seeking FMLA leave. *See* 29 U.S.C. § 2613(a).

(2) is a qualified individual, and (3) suffered an adverse employment action as a result of the disability." *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007). Similarly, under the MHRA, "it is an unfair employment practice for an employer . . . not to make reasonable accommodation to the known disability of a qualified disabled person." Minn. Stat. § 363A.08, subd. 6. Because such claims are generally analyzed using the same analytical framework – except for one exception not relevant here – it is appropriate to consider them together. *See Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).

Under the ADA, "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A). Here, Kobus contends that his "anxiety disorder and/or depression" qualifies as a "mental impairment" under the ADA, and that he is substantially limited in the major life activity of working.[7] A person qualifies as "substantially limited" in the activity of working if he is

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job[, however] does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

In the Court's view, the question of whether Kobus has met this standard is a close

---

[7] While St. Scholastica addresses additional possible activities in its brief, this is the only major life activity expressly addressed by Kobus.

call. It is undisputed that Kobus worked as a painter until just a few days before his resignation. Although he mentions that he had discussed some of his personal difficulties with Orlowski in November 2006, he has not brought forward any other evidence that he was limited in his ability to function in his job. Moreover, Kobus admitted in his deposition that he had ten painting jobs between his resignation in January 2007 and his May 2008 deposition. (Kobus Depo. at 15.) When asked why he had worked as an independent contractor since his resignation, rather than applying for other jobs, Kobus stated "I don't want to work for an employer anymore after this last episode." (*Id*. 16.) When asked why he had not maintained membership in the painter's union, Kobus stated "[b]ecause I don't want to travel, and I did a lot of traveling with the painters' union." (*Id*.) In other words, Kobus did not mention that his job search had been limited by concerns over his capacity to work.

On the other hand, the doctor's form used in Kobus's DEED proceeding specifically indicated that Kobus was "unable to function due to his depression." (Peterson Aff. Ex. B.) The doctor also checked "yes" next to the question, "Was it medically necessary for the patient to leave the above employment [with St. Scholastica] due to this illness or disability?"[8] (*Id*.) The strength of this evidence is somewhat diminished by the fact that it came more than a month after Kobus's resignation.

---

[8] DEED's actual findings and decision are quoted in the background section above. Though those materials would further support Kobus's claim, Minnesota law specifically bars their use in later proceedings. Minn. Stat. § 268.105, subd. 5a. The doctor's note used as an exhibit in those proceedings, however, does not appear to fall under this prohibition. *See* Minn. Stat. § 268.105, subd. 5(c) (noting only that "testimony" may not be used in later proceedings). In any event, the Court need not resolve this issue, because St. Scholastica had insufficient notice of Kobus's disability to support a claim under either the ADA or the MHRA.

However, when it is placed alongside the undisputed evidence concerning his earlier anxiety diagnosis and treatment regimen – as well as the life events that followed – it may well create a plausible basis for concluding that Kobus was experiencing a substantial limitation.

The Court need not conclusively resolve this question, however, because even if Kobus was suffering from a qualifying limitation, he did not provide St. Scholastica with sufficient information to make them aware that his condition implicated the ADA.  The ADA requires employers to make reasonable accommodations for "**known** physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A) (emphasis added).  Accordingly, "[b]efore an employer must make accommodation for the physical or mental limitation of an employee, the employer must have knowledge that such limitation exists."  *Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 629 (8th Cir. 1995).  Moreover, where, as here, "the disability, resulting limitations and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, **the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.**"  *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998) (internal quotation marks omitted; emphasis original); *see also Rask v. Fresenius*, 509 F.3d 466, 470 (8th Cir. 2007) (finding that a plaintiff failed to specifically identify limitations arising from a disability where she merely noted problems with medication for her depression).

Here, Kobus failed to provide St. Scholastica with a sufficient basis to associate

his complaints with an underlying, qualifying disability. As an initial matter, Kobus has conceded that he did not inform St. Scholastica of the fact that he was on medication, or that he was suffering from depression. (Kobus Depo. at 107-08.) Indeed, he declined to make these disclosures on three separate occasions when he discussed either his condition or his departure with St. Scholastica management: (1) in November 2006, when he first discussed leave with Orlowski; (2) in his discussions with Orlowski in January 2007, when he believed that his condition threatened his ability to work; and (3) in his exit interview with Sikkink. Moreover, in addition to declining to disclose those matters, some of Kobus's statements and actions may well have discouraged an inference that he was disabled. As detailed above, after Orlowski raised the possibility of FMLA leave in November 2006, Kobus told him that he did not leave because he "thought [he] could handle it." (*Id*. at 85.) Then, when the subject of FMLA leave arose in January 2007, Kobus told Orlowski that getting a doctor's certification of his condition would be "trouble." (Kobus Depo. at 91.) In addition, Kobus's description of the series of tragedies in his personal life may have had the unfortunate effect of providing St. Scholastica with an alternative, non-disability-related explanation for why he was experiencing difficulties. Finally, as noted above, the record contains no evidence that Kobus exhibited work limitations in the time leading up to his resignation.

Against that background, the Court concludes that Kobus's general complaints about stress and anxiety – even with his mention of mild accompanying physical symptoms – were insufficient to provide St. Scholastica with notice that he had a qualifying disability under the ADA. As explained above, the guidelines for

demonstrating disability on the basis of an inability to work are demanding, and there are special difficulties that arise when an employee's disability is "not open, obvious, and apparent to the employer." *Wallin*, 153 F.3d at 689. The Court is sympathetic to the difficulties these standards may create for employees with mental health issues. These employees may be reluctant to reveal their condition, for fear of being unfairly stigmatized by uninformed colleagues. Certain conditions may also be an obstacle to successfully assessing and communicating their limitations. However, some minimum threshold still must be reached in order to justify the imposition of legal liability against an employer. Here, where the record contains no specific evidence that Kobus's limitations were apparent at work; where he repeatedly declined to reveal his diagnosis to his employer; where he expressed doubt about his ability to confirm his diagnosis with a doctor; and where he failed to affirmatively indicate an interest in pursuing FMLA leave after that option was suggested by his employer – even after it was apparent that his alternatives were limited – the Court concludes that this threshold has not been met.[9]

---

[9] The Court notes that Kobus has pointed to the EEOC's Enforcement Guidance on the Americans with Disabilities Act, which notes that an employer may be on notice of ADA implications where an employee asks for time off because he is "depressed and stressed." EEOC, EEOC ENFORCEMENT GUIDANCE ON THE AMERICANS WITH DISABILITIES ACT AND PSYCHIATRIC DISABILITIES at Question 17 (1997), *available at* http://www.eeoc.gov/policy/docs/psych.html. That same passage adds, however, "if the employee's need for accommodation is not obvious, the employer may ask for reasonable documentation concerning the employee's disability and functional limitations." *Id*. In addition, a later passage in the EEOC's enforcement guidance further discusses this issue. The EEOC notes that while a statement that an employee is "depressed and stressed"

> is sufficient to put the employer on notice that he is requesting accommodation, **the employee's need for accommodation is not obvious on this statement alone**. Accordingly the employer may require reasonable documentation that the

(Footnote continued on next page.)

In sum, Kobus has failed to provide legally sufficient evidence that he made a qualifying disability known to his employer. Thus, he failed to trigger St. Scholastica's obligation to provide a reasonable accommodation under the ADA. Accordingly, the Court grants St. Scholastica's motion for summary judgment as to Kobus's ADA and MHRA claims.

### III.   CONSTRUCTIVE DISCHARGE

"Constructive discharge occurs when an employer deliberately creates intolerable working conditions with the intention of forcing the employee to quit and the employee does quit." *Elnashar v. Speedway SuperAmerica*, LLC, 484 F.3d 1046, 1058 (8th Cir. 2007) (internal quotation marks omitted). "To show he was constructively discharged, [Kobus] would have to show that a reasonable person in his situation would find the conditions intolerable and that [St. Scholastica] intended to force him to quit." *Id*.

Kobus alleges that he "was constructively discharged on or about January 19, 2007, because the Defendant refused to provide him with leave to accommodate his disability." (Am. Compl. ¶26.) As St. Scholastica points out, however, "constructive

---

(Footnote continued.)

> employee has a disability within the meaning of the ADA and, if he has such a disability, that the functional limitations of the disability necessitate time off.

*Id.* at Question 21, Example A (emphasis added). That explanation describes almost exactly what occurred here. As explained above, Kobus had not effectively made his limitations or disability known to St. Scholastica before his request for leave in January 2007. In those circumstances, St. Scholastica reasonably sought medical confirmation of his medical status. Kobus expressed doubt about his ability to provide such confirmation, and did not suggest any interest in seeking it even after Orlowski informed him that his alternative leave options were limited. In short, he gave his employer no legally sufficient basis for concluding that he required an accommodation under the ADA.

discharge is a companion tort." *Huyen v. Driscoll*, 479 N.W.2d 76, 81 (Minn. Ct. App. 1991). As such, it may only be maintained where a plaintiff can establish some separate "underlying illegality." *Id*. Here, the possible "underlying illegalit[ies]" alleged by Kobus are unsustainable, for the reasons given above. Accordingly, the Court grants St. Scholastica's motion for summary judgment as to Kobus's constructive discharge claim.

### ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that St. Scholastica's Motion for Summary Judgment [Docket No. 50] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  February 5, 2009                                     ____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                                             JOHN R. TUNHEIM
                                                                                      United States District Judge